**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210412-U

Order filed July 28, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0412 Circuit No. 20-CF-362 |
| DUJUANE P. NELSON, | ) ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Presiding Justice Holdridge and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Defendant did not receive ineffective assistance of counsel and the court properly considered defendant's continued assertion of innocence as a factor of his rehabilitative potential.

¶ 2     Defendant, Dujuane P. Nelson, appeals from his first degree murder conviction. Defendant argues that trial counsel provided ineffective assistance where he failed to (1) move for a dismissal of the charge on speedy trial grounds, and (2) object to the admission of evidence which established or implied that he committed prior bad acts and embraced gun violence.

Further, defendant contends that the Peoria County circuit court relied on an improper factor in aggravation at sentencing. We affirm.

¶ 3                                               I. BACKGROUND

¶ 4        The State charged defendant with first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), stemming from the June 29, 2020, shooting of Andre Leathers. The charge alleged that defendant, "without lawful justification and with the intent to kill *** Leathers, shot *** Leathers with a firearm *** thereby causing the death of *** Leathers." Defendant was taken into custody on July 17, 2020. At his July 23, 2020, arraignment defendant made an oral demand for a speedy trial. The matter was set for a jury trial on October 26, 2020. One week prior to trial, the parties indicated to the court that they were attempting to contact a potential alibi witness. The trial was continued on the State's motion. Defense counsel expressly indicated to the court that it had no objection to the continuance. A new trial date of December 14, 2020, was set.

¶ 5        On December 3, 2020, the court struck the December 14 trial date and reset the matter for trial on March 8, 2021. The court explained that, per the chief judge's order, no jury trials could be held prior to January 8, 2021, due to the COVID-19 pandemic. A written order was issued which indicated that this continuance was on both parties' motion. The trial was continued on defendant's motion a final time on February 25, 2021, before commencing on June 1, 2021.

¶ 6        At the jury trial, Shameka Hardy, a 911 operator, testified that on June 29, 2020, at approximately 11:32 p.m., she received a call from a female reporting the shooting of Leathers. The recording of the call was admitted and published to the jury. The caller identified defendant as the individual who shot Leathers and provided a description of his clothing and direction of travel. Hardy indicated that the call was unique due to the clear identification of the shooter and number of details provided.

2

¶ 7     Precious Thomas testified that she hosted a party at her residence on Saratoga Street on June 29, 2020. It began at approximately 3 p.m. She indicated that she had met Leathers and his girlfriend at the liquor store earlier that day and invited them. They arrived at the beginning of the party. Thomas testified that she and others consumed alcohol and marijuana at the party. At approximately 10:30 p.m., defendant arrived at the party. Defendant and Leathers argued on Thomas's back porch for 10 to 15 minutes while Thomas was inside her residence. She heard a gunshot and stepped outside to investigate. Thomas observed Leathers, dead, on the stairs of the porch. She also observed defendant walking away from the area with his brother, Malik McCoy. As he walked away, defendant "was fixing something in his pocket." Thomas could not recall what the item was. When asked what the item looked like, Thomas testified that she observed the handle of a gun. She stood and demonstrated defendant's actions for the jury. Thomas immediately called 911. Police arrived shortly thereafter.

¶ 8     Officer Saul Espinal of the Peoria Police Department testified that he was patrolling the area around Saratoga Street on the night of June 29, 2020. At approximately 11 p.m., Espinal heard yelling coming from Saratoga Street. Thirty minutes later, he received a dispatch of a shooting victim. Espinal and another officer were the first to arrive on scene. They observed Leathers on the ground with a gunshot wound to the head. Espinal spoke with Thomas. He described Thomas's demeanor as erratic and upset. While speaking with Thomas, Espinal did not smell any alcohol or marijuana. Espinal testified that he did not believe Thomas was intoxicated. Thomas informed Espinal that defendant shot Leathers. She described his clothing and direction of travel. Espinal recorded the exchange on his body camera. The video of Espinal's interaction with Thomas was admitted and published to the jury.

¶ 9        Leathers's autopsy revealed that he was shot at close range. The bullet entered Leathers's mouth and exited the back of his neck. It was determined that Leathers's cause of death was a gunshot wound to the neck.

¶ 10       Aronna Armstrong testified that she and Leathers were in a relationship. On June 29, 2020, they encountered Thomas in a liquor store and were invited to a party at her residence on Saratoga Street. Individuals at the party were consuming alcohol. Leathers also consumed alcohol. Eventually, two men, who Armstrong did not know, appeared. One man began arguing with Leathers about gang-related matters on the porch. Armstrong made multiple attempts to get Leathers to leave but he would not. She observed the man who had been arguing with Leathers walk up and shoot Leathers in the face with a black gun. Armstrong went to her vehicle and called 911. Later, police showed Armstrong a photographic lineup, but she was unable to identify the shooter.

¶ 11       Tatiana Weldy, defendant's girlfriend, testified that on the evening of June 29, 2020, she had been communicating with defendant via Facebook messenger. She had been irritated with defendant for "hanging out with" another woman. Weldy read a portion of the messages. At approximately 9:46 p.m., Weldy received a message from defendant which read "I just took a pipe." Weldy indicated that this meant a firearm. Less than 10 minutes later, defendant messaged Weldy that he "need[ed] a ride." Weldy testified that she did not give defendant a ride that night. Shortly before his arrest, defendant instructed Weldy to tell officers, if they ever asked her, "that [she] picked him up on Butler at 11:30 and gave him a ride to the Taft." Weldy complied with defendant's request and initially informed detectives that she gave defendant a ride. After detectives confronted her with her cell phone records, Weldy admitted that she lied and had not picked defendant up.

4

¶ 12       McCoy testified that he spent June 29, 2020, with defendant. They went to a barbeque that afternoon and over several hours they drank two bottles of Hennessy. After they left, they went to Thomas's residence on Saratoga Street. McCoy was not sure if defendant had gone to Thomas's residence with him. McCoy recalled an argument taking place but did not recall who was involved. McCoy admitted that during his interview with detectives on June 30, 2020, he identified the parties involved in the argument as defendant and another unknown man. He testified that he lied to detectives about defendant being involved in the argument. McCoy remembered freezing when he heard the gunshot. McCoy approached the porch and observed the man at the bottom of the steps. McCoy testified that defendant was not there after the gunshot was fired. He could not recall whether defendant had been there prior to the gunshot. McCoy admitted that defendant had been arguing with the man but thought that was earlier in the evening. McCoy indicated that during his interview with detectives, he was inebriated and "made up a lot of stuff." During the interview, McCoy both described and demonstrated the shooting for detectives. He testified that he could not remember this because he was under the influence during his interview. McCoy testified that he lied to detectives when he told them that defendant had shot the man.

¶ 13       Detective Scott Hulse of the Peoria Police Department testified that during his investigation into Leathers's murder, he interviewed several witnesses. On June 30, 2020, at approximately 4 a.m., Hulse interviewed McCoy. Their interview was video recorded. Hulse testified that McCoy did not appear to be intoxicated at the time of his interview. He indicated that McCoy had no issues understanding and answering the questions asked of him. Hulse further testified that he was able to hear McCoy's answers and did not observe any slurred speech.

¶ 14       The video recording of McCoy's interview was admitted and published to the jury. McCoy told Hulse that they had been at the party approximately 30 minutes before the man was shot. He

5

indicated that defendant and the man began arguing almost immediately upon their arrival. When asked by Hulse to explain the incident, McCoy stated: "I don't know. He just tweaked." McCoy indicated that defendant did not say anything before he shot the man, nor did he explain his reason for doing so. McCoy told Hulse that the situation was de-escalating. The man was on the second step of the back porch and defendant appeared to be walking away when he suddenly turned and shot the man. McCoy demonstrated the event for Hulse.

¶ 15        After the interview, Hulse obtained search warrants for defendant's Facebook account and both defendant and Weldy's cell phones. Through these warrants, Hulse obtained cell-cite location data which he input into Google Earth maps to provide the cell phone locations. The records and maps were admitted into evidence. Defendant's Facebook records consisted of 1356 pages. The records contained photographs of guns and defendant gesturing with his fingers in the shape of a gun. The entirety of the records, including the photographs, were not published to the jury. However, the messages exchanged between defendant and Weldy were published to the jury. In addition to the specific messages that Weldy testified about, the exchange also contained messages from Weldy to defendant that night, which indicated that defendant had been repeatedly threatening to kill her.

¶ 16        Hulse testified that he interviewed defendant after his arrest on July 17, 2020. A portion of the video recorded interview was admitted and published to the jury. In the video, Hulse informed defendant that he was not free to leave and asked if he had ever been read his *Miranda* rights for any reason. Defendant answered "yes." Hulse read defendant his rights and defendant agreed to speak with him. Defendant denied being at the party on Saratoga Street on June 29, 2020. He informed Hulse that earlier in the day, he attended a barbeque at a house on Glendale Avenue. Defendant left that location before dark. Defendant obtained a ride from a friend to a house on

6

Butler Street. Defendant did not know what time he left the house on Butler Street but indicated that Weldy and her cousin provided him with a ride to the Taft Homes.

¶ 17    Hulse testified that the cell-cite location data from Weldy's phone at the time of the murder was in the area of north Peoria. The area did not include either the Glendale residence that defendant stated he was at earlier in the day or the Taft Homes. Defendant's cell-cite location data indicated that at approximately 11:20 p.m. defendant's phone was not in the area of the Taft Homes or the location of the murder. When questioned by the defense, Hulse explained that at 10:53 p.m. and 11:20 p.m. defendant's cell phone interacted with a cell tower near Butler Street. Hulse testified that the Saratoga Street address fell outside the projected area demonstrating where defendant's cell phone could have been located by a "[c]ouple of blocks," exceeding the 300-meter margin of error provided by defendant's cellular service provider. However, Hulse indicated that defendant's records were marked as low confidence records. Hulse testified that low confidence records have a margin for error that is greater than 300 meters.

¶ 18    The jury found defendant guilty. It also found that the State had proven defendant personally discharged a firearm, proximately causing the death of another. Defendant filed a motion for new trial which was denied.

¶ 19    A sentencing hearing was held on July 22, 2021. The presentence investigation report (PSI) indicated that defendant had three incidents while awaiting trial in the Peoria County jail which resulted in disciplinary action. As a juvenile, beginning at the age of 9, defendant was adjudicated delinquent for both misdemeanor and felony criminal damage to property, several instances of criminal trespass, battery, and burglary. In 2011, defendant was convicted in criminal court of residential burglary and attempted residential burglary. In 2013, defendant was convicted of unlawful possession of a weapon by a felon. Defendant served a period of imprisonment on all

three of these convictions. In 2018, defendant was convicted of misdemeanor domestic battery and resisting a peace officer. Defendant dropped out of high school after the eleventh grade and did not obtain a general education diploma. He had several disciplinary incidents in high school, including fighting and threats of violence. Defendant was unemployed. His employment history reflected that he worked for two months in 2019 and for one month in 2020. Defendant had three young children. Defendant reported that he was not affiliated with any gangs, however, his jail records from 2015 indicate that he was a part of the Gangster Disciples. Defendant believed he was wrongfully convicted of the murder.

¶ 20        At the hearing, Leathers's mother testified about her son and the impact of his loss on their family and the community. Defendant's father addressed the court insisting that defendant had not murdered Leathers. Defendant made a statement in allocution maintaining his innocence and expressing his belief that he had been wrongfully convicted.

¶ 21        The court sentenced defendant to 75 years' imprisonment. In pronouncing its sentence, the court considered two factors in aggravation: defendant's criminal background and the need for deterrence of others. It found no applicable factors in mitigation. The court spoke at length about defendant's rehabilitative potential. It found defendant's prospects for rehabilitation were "either slim or none." The court explained:

> "People are out there living their lives, building up a track record. I've
> built one up. Prosecutors have built one up. [Defense counsel's] built one up.
> We've all lived our lives in certain ways, and done certain things, and built a track
> record.
>
> I've got zero felony convictions. The defendant has 3, and he's 28, and has
> spent time in prison. So. Some people would say, 'Only 3.' Well, that's 3 more

8

than I have and 3 more than any person should have. And like I say, prison removed some of the—some of his 28 years, where he could have been out doing—committing other felonies.

\*\*\*

Rehabilitation. Okay, you screwed up in high school, did not come out with a high school diploma. Terrible work history. It's so light, has to qualify, in my opinion, as terrible, especially when you have 3 children to support. \*\*\*

In school, defendant did a bad job. At work, he did a bad job."

¶ 22    Defendant filed a motion to reconsider sentencing, alleging, *inter alia*, that the court had erred in finding he lacked rehabilitative potential. At hearing, the court reiterated that "the PSI says that he is a high school dropout. He is 27 years old and has worked a total of three months in his life—three months out of 27 years—and he has got three children to support." It explained that no one could point to any positive evidence for rehabilitative potential. The court found that "[h]is criminal history [was] bad. His education [was] bad. His employment status [was] bad." The court commented that " '[t]he Defendant feels he was wrongfully convicted.' So right there is a big hurdle to rehabilitation. But that's a minor part of my calculations." The court denied defendant's motion. Defendant appeals.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, defendant argues that trial counsel provided ineffective assistance where he failed to (1) move for dismissal of the charges on speedy trial grounds, and (2) object to the admission of prejudicial evidence which established or implied that he committed prior bad acts and embraced gun violence. Further, defendant asserts that the court relied on an improper factor in aggravation at sentencing.

9

¶ 25                              A. Ineffective Assistance of Counsel

¶ 26        Defendant first claims that he received ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance, a defendant must establish that (1) counsel's performance fell below an objective standard of reasonableness; and (2) defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 27                                    1. Speedy Trial Violation

¶ 28        A defendant in Illinois has both a constitutional and statutory right to a speedy trial. *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). The statutory right to a speedy trial is found in section 103-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5 (West 2020)). Section 103-5(a) states, *inter alia*, "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." *Id.* § 103-5(a). The 120-day period begins to run automatically if a defendant remains in custody pending trial. *People v. Wooddell*, 219 Ill. 2d 166, 174 (2006). Anyone not tried in accordance with section 103-5(a) "shall be discharged from custody or released from the obligations of his bail or recognizance." 725 ILCS 5/103-5(d) (West 2020).

¶ 29        Defendant asserts that counsel provided ineffective assistance for failing to move for a dismissal of the charges after defendant's right to a speedy trial was violated. "Counsel's failure to assert a speedy-trial violation cannot establish either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy-trial objection. [Citation.] Accordingly, we must first

determine whether defendant's right to a speedy trial was violated." *People v. Phipps*, 238 Ill. 2d 54, 65 (2010).

¶ 30    Defendant argues the December 3, 2020, continuance was not attributable to him and did not toll the speedy trial period when the court *sua sponte* continued the jury trial. At that time, courts were in the midst of dealing with the COVID-19 pandemic. In response to the pandemic, our supreme court entered an order allowing circuit courts to continue trials due to COVID-19 and provided that "such continuances shall be excluded from speedy trial computations contained in section 103-5 of the Code ***. Statutory time restrictions in section 103-5 of the Code *** shall be tolled until further order of this Court." Ill. S. Ct., M.R. 30370 (eff. May 20, 2020). This order remained in effect until October 1, 2021. See Ill. S. Ct., M.R. 30370 (eff. June 30, 2021). The Tenth Judicial Circuit issued an administrative order to this effect, which indicated that jury trials would be halted between November 24, 2020, and January 8, 2021, due to a rising number of COVID-19 cases in the area comprising the judicial circuit. See 10th Judicial Cir. Ct. Adm. Order 2020-21 (Nov. 24, 2020). The order authorized circuit court judges to continue any jury trials set within that date range and indicated that "to the extent any speedy trial computations and statutory time restrictions are implicated, same shall be tolled until further order of the Supreme Court." *Id.* This administrative order was in effect at the time of the December 3, 2020, continuance.

¶ 31    As an initial matter, defendant points out the discrepancy between the report of proceedings and the written continuance order from that day. The court's oral pronouncement on December 3, 2020, definitively demonstrated that the case was being continued pursuant to the administrative order and not on the motion of either party. Thus, we agree that the issue at hand is not whether the period tolled due to defendant's agreement to the continuance but whether our supreme court had the authority to toll the statutory speedy trial period in response to the ongoing pandemic. See

11

*People v. Smith*, 242 Ill. App. 3d 399, 402 (1993) ("When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement of the court controls.").

¶ 32　　　　Defendant argues the supreme court's administrative orders tolling the speedy trial period are an unconstitutional violation of the separation of powers. Our supreme court has recently considered this issue and found no violation of separation of powers occurred "[b]ecause section 103-5(a) involves the scheduling of trials, the statute is a matter of court procedure and within this court's constitutional authority over all state courts. Where, as here, a statute and a supreme court rule governing court procedure cannot be reconciled, the statute must give way to the rule." *People v. Mayfield*, 2023 IL 128092, ¶ 3. Defendant makes no other arguments to preclude the application of the COVID-19 orders and has, therefore, forfeited any additional arguments in response to this finding. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Accordingly, defendant's speedy trial rights were not violated, and counsel was not ineffective for failing to move for dismissal on speedy trial grounds.

¶ 33　　　　　　　　　　　　2. Failure to Object to Prejudicial Evidence

¶ 34　　　　Defendant next asserts that trial counsel provided deficient performance by failing to oppose the admission of certain evidence, including: (1) Facebook messages between defendant and Weldy which contained prior unrebutted threats of violence against Weldy; (2) photographs of guns and defendant making a gesture with his hands in the shape of a gun; and (3) evidence of defendant's prior interactions with the police in the form of testimony from Hulse and a video of defendant's police interview. Where there is no prejudice, a reviewing court need not decide whether counsel's performance was deficient. *People v. Evans*, 186 Ill. 2d 83, 94 (1999).

¶ 35     Assuming, *arguendo*, that counsel's performance was deficient, defendant suffered no prejudice from the inclusion of the complained of evidence. To show prejudice, defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In weighing the impact of counsel's errors, a reviewing court should consider the totality of the evidence before the finder of fact. *Id.* at 695.

¶ 36     Here, Thomas consistently told the same version of events. In her call to 911, her videotaped statements to police, and her testimony at trial, she identified defendant as the individual who was arguing with Leathers on her porch. Thomas heard a gunshot, exited her residence, and observed defendant walking from the scene with McCoy while "fixing something in his pocket." Thomas indicated numerous times that the "something" she had observed was the handle of a gun. Thomas demonstrated defendant's actions in "fixing" the object to the jury.

¶ 37     McCoy, in his police interview, told detectives that defendant and a man had been arguing. The man was on the step of the porch. Defendant appeared to be walking away but suddenly turned and shot the man in the face. McCoy demonstrated the events for detectives. He did not appear to be inebriated at the time of his interview. At trial, McCoy testified inconsistently with his June 30, 2020, statements. However, McCoy did testify that defendant had been arguing with the man that evening.

¶ 38     Armstrong observed the argument between Leathers and the shooter. She was unable to identify the shooter in a photographic lineup or in court but was very clear that the man who shot Leathers was the man who was arguing with him on Thomas's porch.

¶ 39     Even discounting the information provided by McCoy in his police interview, the eyewitness evidence establishes that defendant shot Leathers. Thomas and McCoy identified

13

defendant as the man arguing with Leathers. Armstrong observed the man who was arguing with Leathers shoot him. Immediately after Leathers was shot, Thomas observed defendant adjusting a gun handle in his pants while walking away with McCoy. Given this strong evidence of defendant's guilt, it is not reasonably probable that the jury would have reached a different verdict had the complained of evidence been excluded.

¶ 40                                    B. Improper Sentencing Factor

¶ 41        When imposing a sentence, the court must craft "a sentence that strikes an appropriate balance between the protection of society and the rehabilitation of the defendant." *People v. Bush*, 2022 IL App (3d) 190283, ¶ 118. Absent an abuse of discretion, a court's sentencing decision will not be reversed. *Id.* "Consideration of an improper factor in aggravation affects a defendant's fundamental right to liberty, and therefore, is an abuse of discretion." *People v. McAfee*, 332 Ill. App. 3d 1091, 1096 (2002). "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Larson*, 2022 IL App (3d) 190482, ¶ 29. "[W]hen a circuit court considers an improper factor in sentencing a defendant, the court's sentencing decision must be vacated and the case remanded for resentencing unless it is clear from the record that the improper factor was so insignificant that its consideration did not result in a greater sentence." *People v. Young*, 2022 IL App (3d) 190015, ¶ 23.

¶ 42        Defendant contends that the court improperly considered defendant's assertion of innocence as a factor in aggravation at sentencing. He argues that the record establishes that the court faulted defendant for his continued protestations of innocence and implicitly indicated that defendant would have received a lesser sentence if he had abandoned his assertion of innocence. We disagree.

14

¶ 43    A court may consider a defendant's lack of penitent spirit when fashioning an appropriate sentence because it may have a bearing on defendant's potential for rehabilitation. *People v. Coleman*, 135 Ill. App. 3d 186, 188 (1985); see *People v. Ward*, 113 Ill. 2d 516, 530 (1986) (explaining that relevant evidence of defendant's potential for rehabilitation may be conveyed through "his continued protestation of innocence and his lack of remorse"). However, protestations of innocence and lack of remorse must be considered in light of all the evidence presented to the court and "must not be automatically and arbitrarily applied as aggravating factors." *Ward*, 113 Ill. 2d at 529.

¶ 44    At the initial sentencing hearing, the court spoke at length about defendant's rehabilitative potential. It highlighted defendant's multiple felony convictions, poor school history, and "[t]errible work history," finding defendant's rehabilitative potential to be either "slim or none." At the hearing on defendant's motion to reconsider the sentence, the court again discussed its finding on defendant's lack of rehabilitative potential. It reiterated that defendant dropped out of high school and had a work history which spanned merely three months. The court stated that defendant's "criminal history [was] bad. His education [was] bad. His employment status [was] bad." The court indicated that it saw nothing that demonstrated that defendant would be able to be rehabilitated. After discussing these findings at length, the court stated: " 'The Defendant feels he was wrongfully convicted.' So right there is a big hurdle to rehabilitation. But that's a minor part of my calculations."

¶ 45    The record reveals that the court considered numerous factors in determining defendant's rehabilitative potential. Contrary to defendant's assertion, the court's indication that defendant's protestation of innocence was a minor consideration, in context, does not demonstrate that the court would have provided defendant a lesser sentence had he admitted guilt, but that the weight

15

placed on that factor was insignificant in its determination of defendant's rehabilitative potential. We find the court properly considered defendant's continued assertions of innocence in its determination of defendant's rehabilitative potential. Accordingly, we affirm defendant's sentence.

¶ 46                                    III. CONCLUSION

¶ 47          The judgment of the circuit court of Peoria County is affirmed.

¶ 48          Affirmed.